The next case on for argument is Cressy v. Proctor. Mr. Scherzer. Good morning, Your Honor. Mark Scherzer for the appellant, Kevin Proctor. At issue here is whether the Court erred in awarding quantum merit damages to plaintiff Ron Cressy for the services he provided without formal salary to my client's advertising business. We believe the Court erred in a number of respects. First, because it did not recognize appropriately that this was in the context of Mr. Proctor providing Mr. Cressy with complete, generous personal support for years before and years after those services were provided without any expectation of contribution by Mr. Cressy. So that when Mr. Cressy admittedly initiated his services as a volunteer and never said anything to the contrary for the next 14 years, Mr. Proctor had every reason to assume in all good conscience that those services were volunteered. And as set forth in the illustration 2 to section 28 of the Restatement of Restitution, which both parties agree the Restatement of Restitution here would govern in Vermont where Vermont law is not fully developed, that's an important consideration, that you would presume the services to be gratuitously provided in a situation of the affluent lifestyle enjoyed with absolutely no obligation to contribute. So did Judge Sessions get it wrong as a matter of law? I believe he got that wrong as a matter of law. He also found it— Is he guided by Vermont law and sort of domestic relations issues? He relied heavily on Harmon v. Rogers, a Vermont Supreme Court case, which doesn't address this context of the completely supported relationship and the gratuitous volunteering of services that's never been disputed after that. I mean, it's a different context. It's a different example under the Restatement of Restitution. And we think that's the closest circumstance to this circumstance. We think the Court also erred in not recognizing that Mr. Proctor was entitled to an offset for the support he continued to provide Mr. Cressy long after the business was closed, four and a half years, during which point, and this is during which time, and this is undisputed in the evidence, Mr. Cressy refused to go out and get a job. So under the Restatement of Restitution, this is not intended to be, and Section 28 is all about nonmarital relationships and how you deal with restitution claims in that context. It's not intended to be a general provision for equitable distribution between unmarried parties. It's intended— And viewed Mr. Cressy's contributions to Mr. Proctor's business, working full-time, from the finding was July 1994 for many years to 2008, as having made an extraordinary contribution to an asset. He said it was a substantial contribution, and that's one issue of what it looks like. What was wrong with that determination? Well, if you look at what material benefit to a business is generally, it's something not where you just are doing administrative tasks through, and this was a business that was running out, running down, which was in its last years throughout this period. He did nothing to change the business, to improve the business. He did administrative services like a very good office manager would have, undoubtedly of value. But the question is then, did he, even assuming Judge Sessions is right, that he contributed value to the business as an entity, the question then under the Restatement of Restitution, which is focused in this section on a specific asset that you've contributed to, did then the other party unreasonably retain the value that was contributed? And here that was not the case. Because the business closed? Mr. Proctor closed the business in 2008, at which point it had no further value. He did that in order to care for his dying father. Mr. Cressy continued to live with Mr. Proctor for the next nearly five years, during which time the $780,000 that was remaining in the business's bank account was spent on both parties' support. So Mr. Proctor did not retain the asset unjustly for his own benefit. He used it for both of their benefits. Now, Judge Sessions appeared to believe that if you went into the issue of the offset for that further support, you would be stuck going into things that courts would prefer not to do, which is, what was the overall burden and benefit between the parties in their relationship? But I think the Restatement actually offers us a way of moving from that to looking at whether you actually retained the specific asset unjustly. And here, he did not. He used it for Mr. Cressy's support. And he showed— Is there adequate evidence of that in the record? Absolutely. I think that 649, Mr. Proctor has a summary sheet of the funds used during those years for Mr. Cressy's benefit, and add up to well in excess of the amount that the experts both said Mr. Cressy's services had been worth before that, taking into account—or at least losses he suffered before that from not having a cash salary. The court did recognize that he had been offsetting benefits during the time he was working, but then made those benefits irrelevant for the following period. So Mr. Proctor is essentially being penalized for having the asset and using it for Mr. Cressy's benefit, and now he's being told that you get no credit for that, now you have to compensate Mr. Cressy in addition. We think that's quite unfair. Mr. Cressy also sat on his rights for an extended period of time. He knew—of course, he said at the beginning, and this is when he went on full-time work, which is what the judge felt was equivalent of making him a nonvolunteer. He said, I was in a committed relationship, I had free time on my hands, I was glad to help out with the situation, I had my own money, which he retained throughout the relationship, I didn't really need a paycheck, it was just a natural thing for me to help out with my partner's business. He knew he wasn't being paid, he never said a word about compensation, which is in contrast to all the cases that the plaintiffs cited in their brief, where that sort of compensation was a flashpoint in the relationships. And then when the business closed and Mr. Proctor spent the assets down until they were completely exhausted and he was out of money, that's when Mr. Cressy asserted his claim. So, which means that the only way Mr. Proctor could satisfy a judgment for Mr. Cressy's claims would be to dismantle the farm he worked so hard to achieve, rather than having reserved money from the outset to satisfy this claim that his partner was keeping secret from him. So we think the Court erred in ignoring all those factors that need to be taken into account, along with the substantial nature of the value of the services. Thank you, Mr. Scherzer. Thank you. And you've reserved some time for rebuttal. Mr. McLaughlin. Good morning, Your Honors. May it please the Court to represent Mr. Cressy in this matter. So, obviously from our perspective, Judge Sessions did not abuse his discretion in going ahead and giving us a quantum merit recovery. I've got the stark example of somebody who worked 14 years, 40 hours a week for the company. At the end of the relationship, I've got $500 in Mr. Cressy's pocket. I've got close to $2 million in Mr. Proctor's pocket. And I've got the understanding from Mr. Cressy that he wasn't simply working for room and board. He was working towards this mutual business, family business, and that he wouldn't be left out in the cold. And so when you look at all those factors, was it an abuse of discretion? I want to address, it was a little out of turn for me, but in terms of what the attorney for Mr. Proctor was talking about in terms of depletion of the asset or fully consume the asset. That's just not true. Synergy advertising closed in 2008. That's correct. The bank accounts of Synergy are ultimately depleted. That's correct. But what they overlook is what Judge Sessions found, and the evidence absolutely supports, is that Mr. Proctor is sitting on $1.6 million worth of real property, a bunch of which was, at least per our calculations, $800,000, sorry, $600,000 of which was purchased with Synergy profits. The fact that they're no longer sitting in a Synergy bank account doesn't mean they don't exist. You take the Synergy profits earned while Mr. Cressy is working 40 hours a week, you go ahead and roll those into real property versus a bank account versus an investment. As long as one of those are still alive, you still have an asset. Can you remind me where in the record I would find the backup for what you just said, Mr. McLaughlin? Yes, Your Honor. The easiest way for me to do it is we ended up submitting proposed findings of fact, and those proposed findings of fact, we went through this depletion of asset argument. Frankly, I do want to point out that they didn't defend this saying there is no asset left. The reason this came into play is that we also had an implied contract claim saying we want half of it, and therefore we had to go through the math of what half meant. If you look at our Plaintiffs' Exhibit 21, well, two things. If you look at our proposed findings of fact, the proposed findings of fact talk about damages, and they talk about the amount of money that was earned from Synergy after January 1, 1997. What it entailed, and this is relatively confusing and it isn't part of Judge Sessions' opinion, but it entailed looking at handwritten notes of Mr. Proctor's wealth back in 1998, because we didn't have this forensic evidence, handwritten notes from 1998, testimony about what the CDs were and when those were accrued, and some conclusion from our point of view was that the amount of money that Mr. Proctor had on his own was he had the Long Beach house, he had certain liquid assets, but the CDs were purchased after 1998, or January 1, 1998, and the evidence supported that. So if you look at the proposed findings of fact, it goes into detail to support what Judge Sessions found, and obviously it's a finding subject to clearer review, that a substantial portion of the property retained by Mr. Proctor was purchased with Synergy funds. Thank you. Excuse me. Sorry. Once Mr. Cressy indicated that he wanted to be a partner of Mr. Proctor, is that right? Correct. And Mr. Proctor didn't respond to that? There was a discussion back in 1996 in terms of whether or not Mr. Cressy had obtained partnership status, where Mr. Cressy testified that Mr. Proctor referred to him as a partner in the business, and he understood it to be partner in the business, and he understood it to be an affirmation of what he was already understanding, which is that this is a family business and we're working together. Judge Sessions found that that was not sufficient to support contract law claims, wasn't sufficient to support partnership claims, but was sufficient, well, was one of the pieces of the puzzle in terms of am I going to give quantum merit recovery here, which had me thinking about magic words, you know, you are a partner, you are not a partner, work in express contract, potentially work in implied contract in terms of what's the meeting of the mind, but quantum merit, frankly, shouldn't depend upon whether somebody in 1994 said I'm volunteering or I'm not volunteering or whether that conversation happened or didn't happen, because what you end up having is 14 years of labor, full time, 40 hours a week, and where are the equities going to end up lying, and that's why Judge Sessions didn't find that as a barrier towards quantum merit recovery, equitable recovery. The proof is in the pudding and common sense, which is you work that hard for that business for that long, is it really simply room and board and when you're done, you're done, and under Judge Sessions' view, which this court reviews for abuse of discretion, I think he's amply supportive. The nice part about this, and Judge Hall, you're obviously familiar with this, Vermont doesn't tend to have a lot of substantive law, you know, we don't have an intermediate court. Here, which is a blessing and a curse sometimes, here, thankfully, we're blessed, because we have Harmon v. Rogers, which is 100% supportive of the claim here. Harmon v. Rogers, there the claimant worked for six months running the defendant's grocery store, and our store, I think it was a grocery store, I assume it was a general store, being from Vermont, but they said it was an abuse of discretion not to give quantum merit recovery in that case, and here you've got 14 years, 40 hours a week, thankfully I don't have to say it wasn't an abuse of discretion because we lost, because we didn't lose. You then have the restatement third restitution, and the illustrations that are there, and the restatement third restitution, which quotes, you know, cites to Harmon on illustration number nine, again, looks at this example and says, okay, threshold question, do we have domestic relations services or something beyond that, and the nice easy part about this case is I couldn't get further on the spectrum in terms of something beyond that. I've got 40 hours a week, 14 years working, running, and assisting to run, and at one point running the operations of this business. You then ask is it equitable to go ahead and retain it, and we have two pieces of that. We've got close to $2 million in Mr. Proctor's pocket in terms of the property that he owns, and we've got the fact that our gentleman toiled for the number of years thinking it was a family business, finding out it was legally wrong, and he should be, you know, should he recover on that front. I take your adversary's argument about equities here and his way of distinguishing Harmon is to say that there was, if I'm understanding the argument correctly, the findings of fact are not sufficient to support any, there's nothing in the findings of fact that takes away his argument that essentially this 14 years was overseeing the demise of this business, the eking out of its last profits, and then there's a substantial period where there was a continued support of Mr. Cressy, and in those circumstances it's not like Harmon because there's no material benefit that was conferred on Mr. Proctor that is unjust for him to retain. It's a wash. A bunch of different pieces, all of which are wrong, Your Honor. 94 to 2008, biggest year, they're $3 million a year. One was in 1999 after they moved to Vermont, so the sense that they just wound it down from 94 is completely incorrect. In terms of whether or not there should be an offset, well, whether or not there should be an offset because the business closed in 2008, what Judge Sessions did is said the same way Vermont law doesn't allow recovery for domestic services, we're not going to allow an offset for domestic expenditures. We have a relationship happening, and we're not going to go ahead and impose an offset for that because if you start getting me into that offset analysis, then you're going to get me to try to value my guy's labor on the farm, et cetera, in terms of keeping the animals. So Vermont law keeps that distinct, and we're going to go back to what happened between 94 and 2008. And in 94-2008, the nice part about this is, frankly, we weren't overly greedy. We didn't overreach. The damages we asked for, the equitable damages we asked for, take out housing, take out food. It's just the savings amount, and both experts end up agreeing on that. So that isn't double-dipping to us. And in terms of the fully supported aspect of it, there's no line of cases that says fully supported means no quantum marijuana. I mean, the irony of the fully supported is the funds that were being used to support were on the shoulders of my guy in large part. He was working. I mean, he was creating the synergy proceeds. So to somehow call that a barrier to recovery doesn't make sense. And when you look closely at the cases, Harmon v. Rogers doesn't discuss it, but thankfully, again, we have a Vermont case. Wynkoop does discuss it. I mean, Wynkoop, it's in black and white. I don't know how they get around the language. The female cohabitant in Wynkoop is fully supported. She quits her job to go ahead and build the yurt. You know, welcome to another wonderful Vermont case. And she's fully supported. There's no money that's coming in from her. Harmon, the person who's running the day-to-day operations of the store full time, tell me that there's another source of income that's coming in. The fully supported line doesn't exist in the law. The only case that it's kind of talked about between the two of us is Mitchell v. Moore. And Mitchell v. Moore is kind of fun to look at because it's so inapposite. It's so inapposite. I've got an intermediate Pennsylvania court. I've got the fact that they apply a presumption of gratuitous giving between, you know, that's got to be proven above clear and convincing evidence, isn't part of Harmon, isn't part of Wynkoop, isn't part of any of that. And then I ultimately have a finding in Mitchell that the services rendered, and I wish I had the quote, but I don't, but the services rendered were not of the type that you would expect beyond a personal relationship. This is the complete polar opposite. And so reliance on Mitchell v. Moore I don't find overly persuasive. Thank you for your time. Thank you very much, Mr. McLaughlin. And Mr. Scherzer, you have three minutes. I'd like to address a number of things Mr. McLaughlin just said. One is I was pleased to hear him say that the experts agreed on what the lost savings were to Mr. Cressy. Judge Sessions ignored their agreement and awarded an amount that was based on their first expert's report, which was subsequently revised to reflect Mr. Cressy's actual administrative and not executive functions. As to whether Mr. Cressy asked to be a partner- About the change from 30 to $40 million. Yes. Which makes a big difference in the damages. Well, Mr. Cressy was the only employee when they, is that true? No, Mr. Proctor worked in the business as well. There was Mr. Proctor who was the principal. Yes. Mr. Cressy who did the administrative work. He was the only one. He was paid 30 or 40, whether the computation would be 30 or $40,000, isn't that within the discretion of the district court? I think there was no evidence to support the district court's conclusion. Both experts agreed that the 30-ish thousand was the more appropriate figure, and Judge Sessions went for the 40-ish thousand based on a misinterpretation of what the experts said. Did Mr. Proctor have employees in the prior location? Yes, and in fact, and in the big year he talks about in 1999, he also had Mr. Proctor's sister working for free in the office as well, so that the- No, I'm not asking about before they went to Vermont. Yes, they absolutely had. Up until 1997, they had paid employees. How much was he paying out in salaries at that point? The last two years were $17,000 in 1997, I believe, and $32,000 in 1998 for those administrative services. I'm sorry, $96,000 for those administrative services. But to go back, Mr. Cressy never asked to be a partner. He just said he developed that understanding based on this conversation in which Mr. Proctor used that term about his domestic partner. As to whether we can start looking at the real estate as where the money from Synergy went, as the repository of Synergy's value, the Court did find that Synergy profits went into the real estate. It also found that the proceeds of Mr. Proctor's home in Long Beach went into real estate, that Mr. Proctor had substantial savings and a substantial art collection, all predating Mr. Cressy's arrival. Synergy was a thriving business with its best year before Mr. Cressy ever became involved. If you look at 562 and 563 of the record, that's where Mr. Proctor was making his notes. And unfortunately, few records survive here because of an arson fire where they were stored. But these notes were made by Mr. Proctor to assess what he had in liquid assets at the time he was buying the Vermont farm. And it shows a million dollars in cash exclusive of the Synergy bank account, which always included, as he testified, a half million dollars of his initial capital contribution to the business, all before Mr. Cressy. So that's a million and a half, basically, which was more than the purchase price of the farm in 1998, already existing then. Now, they've tried to say the capital contribution no longer counts because he spent it out and then was replenishing it with new monies that came in. They've tried to say that the CDs that Mr. Proctor computed as part of his assets were bought with recent Synergy profits. But it's useful to keep in mind that the time this purchase was made initially, that Mr. Cressy had conceived himself as being a partner, as having an interest in this business for a little over a year. Mr. Proctor was a man of some wealth before he ever met Mr. Cressy. He had the assets to buy this farm. The Court made no findings about precisely how much of what went where. I think if we're looking at the way the restitution, restatement of restitution is set up, we're looking at whether there was a specific asset to which Mr. Cressy contributed value. The Court's findings on that were that he did to Synergy. And we should look at the Synergy revenues, which the bank account which was totally exhausted supporting these two people for the next five years in assessing whether Mr. Cressy has been done out of anything. Thank you, Mr. Scherzer. Thank you both. We'll reserve decision.